UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Robert B. Kugler, U.S.D.J. |
| v. | : | |
| THOMAS SHER | : | Crim. No. 19-191-6 (RBK) |

---

## MOTIONS *IN LIMINE* AND FOR RECIPROCAL DISCOVERY BY THE UNITED STATES OF AMERICA

---

<u>On the Brief</u>:
CHRISTINA O. HUD
*Assistant United States Attorney*
DESIREE L. GRACE
*Deputy Chief, Criminal Division*
United States Attorney's Office
District of New Jersey

On March 13, 2019, a federal grand jury in New Jersey indicted defendant Thomas Sher on charges of conspiracy to commit health care and wire fraud in violation of 18 U.S.C. § 1349 and several substantive counts of health care fraud in violation of 18 U.S.C. § 1347.  Trial in this matter is set to commence on August 15, 2022.  In advance of trial, the Government respectfully submits these motions.

## I.     FACTUAL BACKGROUND

Defendant Thomas Sher was a firefighter in Margate, New Jersey in 2015.  Sher and his wife, a schoolteacher, had government health insurance through the State of New Jersey.  At the time, government health insurance plans for state and local employees, such as Sher's plan, covered very expensive compound prescription medications. Compound medications are specialty medications that are supposed to be tailored to meet the specific needs of a particular patient and are therefore not mass produced.

The conspiracy in this case was led by William Hickman, who has since pled guilty. Hickman and others working with him discovered that the health insurance plans for New Jersey public employees would pay very high amounts for certain compound medications.   Hickman therefore recruited individuals, personally and through other recruiters underneath him, to obtain medically unnecessary compound prescription medications from several pharmacies, including Central Rexall Drugs, Inc. ("Central Rexall") in Louisiana.[1]   Hickman entered into an agreement with Central Rexall to market compound medications in exchange for approximately half of the insurance

---

[1]  Three executives of Central Rexall were charged in a 24-count indictment on September 16, 2020.  *See United States v. Johnston, et al,* 20-cr-800 (RBK).  Central Rexall's chief executive officer pled guilty to the criminal conspiracy on August 12, 2020.  *See United States v. Taff,* 20-cr-696 (RBK).

reimbursement on prescriptions he and those working under him arranged. Hickman, through his company Boardwalk Medical LLC, received payment from Central Rexall. Hickman then distributed a percentage of that payment to the recruiters under him responsible for arranging the prescriptions, who in turn gave a percentage of that payment to sub-recruiters underneath them. Michael Sher was a recruiter under Hickman.[2] Michael Sher recruited others into the scheme to work underneath him— including his brother, defendant Thomas Sher.

Thomas Sher and his wife received several prescriptions for compound medications in connection with their health insurance plan administered through the State of New Jersey. Sher also recruited numerous family members, friends, neighbors, and members of his gym to agree to receive prescriptions for medically unnecessary compound medications. These prescriptions were primarily signed by Dr. John Gaffney, who was paid and offered remuneration by Sher's co-conspirators in exchange for authorizing the prescriptions. In certain instances, other medical professionals signed the prescription forms, but it was never disclosed to them that the medications were not needed and that the recipients of the compound medications and their family members or friends would be making money from the prescription. And, although compound medications are supposed to be specialty medications tailored to the individualized needs of a particular patient, all of the individuals recruited by Sher received the same medications at approximately the same time.

Under the guise of a "referral fee" or "signing bonus," Sher paid many of these

---

[2] Michael Sher pled guilty to the scheme. *See United States v. Michael Sher*, 18-cr-95 (RBK).

individuals cash to secure their agreement to receive the medications. The prescriptions typically listed the highest number of monthly refills available for the medication—not because such refills were wanted or needed, but to maximize profit. These medically unnecessary medications cost the insurance companies thousands of dollars per month. They often piled up in recipients' homes or were discarded by recipients. And, when insurance stopped covering a particular ingredient in a medication, the co-conspirators swapped that ingredient with another ingredient—which they selected not because it was medically equivalent to the prior ingredient, but rather solely because the new ingredient reimbursed for a high amount by insurance. Sher, in turn, arranged for new prescriptions with the new ingredients for the people he recruited—without having them see a doctor prior to the change and typically without disclosing the ingredient change to them. Sher's direct conduct caused the State of New Jersey to pay out over $936,000.00 for prescriptions that were not needed and which were sought only to enrich himself.

## II.   MOTIONS

### A.   The Court Should Preclude Evidence or Argument Blaming the Victim for Failing to Discover the Fraudulent Scheme.

At trial, Sher may argue or suggest that his conduct was lawful because the victim Pharmacy Benefits Administrator and insurance plans continued to pay for and did not at the time question or cease coverage of the compound medication prescriptions at issue. However, such arguments that "blame the victim" are irrelevant to the issues at trial and would mislead the jury.

It is well-established that "[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *United States v. Coyle*, 63

F.3d 1239, 1244 (3d Cir. 1995).  In *United States v. Leadbeater*, 2015 WL 567025, at *8-9 (D.N.J. Feb. 10, 2015), a mortgage fraud case, the defendants sought to argue at trial that their conduct was lawful because the victim lenders failed to scrutinize the loan applications at issue and did not stop the conduct.  *Id.* at *8.  Chief Judge Simandle rejected the defendants' argument and precluded them from suggesting at trial that the lenders "were not sufficiently careful or prudent in protecting themselves from fraud."  *Id.* at *9.  In so doing, Chief Judge Simandle recognized that "how closely the victim lenders scrutinized the loan applications" was irrelevant at trial and that the relevant inquiry instead was whether "the defendants had an agreement to defraud."  *Id.* (citing *Neder v. United States*, 527 U.S. 1, 24-25 (1999)).  Thus, Chief Judge Simandle barred this irrelevant and misleading "blame the victim" argument.  *Leadbeater*, 2015 WL 567025, at *9; *see also United States v. Rivera-Ortiz*, 14 F.4th 91, 101-02 (1st Cir. 2021) (noting that "the district court repeatedly justified its exclusionary ruling based on a concern that Rivera, in drawing attention to the lack of action by the relevant agencies, might be suggesting a kind of 'blame-shifting' defense that would confuse jurors").

Just as in *Leadbeater* and *Rivera-Ortiz*, it is irrelevant whether the Pharmacy Benefits Administrator and insurance companies unveiled the fraud or ceased payment on the insurance claims at the time.  Rather, what the jury must and solely should consider is evidence relevant to whether: (1) two or more persons agreed to commit health care and wire fraud; (2) the defendant was a party to or member of that agreement; and (3) the defendant joined the agreement knowing of its objective

to commit health care and wire fraud and intended to join together with at least one co-conspirator to achieve that objective. *See Third Circuit Model Jury Instructions* § 6.18.371A.  Blaming the victim or suggesting that the Defendant's conduct was lawful because the Pharmacy Benefits Administrator and insurance plans continued to cover the compound medications would significantly confuse the issues at trial and mislead the jury.  Accordingly, the Court should preclude Sher from arguing or suggesting at trial that the Pharmacy Benefits Administrator and insurance companies' continued payment of claims or failure to identify the fraud are a defense to his conduct.[3]

### B. Statements of Co-Conspirators Should Be Admitted as Non-Hearsay at Trial.

Pursuant to Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay when the Government demonstrates by a preponderance of the evidence that:  (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course of, and in furtherance of, the conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Bobb*, 471 F.3d 491, 498-99 (3d Cir. 2006).  In making a factual determination of the admissibility of co-conspirator statements under this rule, the Court may consider the statements themselves as well as any other independent evidence of the conspiracy.  *Bourjaily*, 483 U.S. at 180-81; *United States*

---

[3] As the Court will recall, it ruled in a related case, *United States v. Monaco*, 19-cr-716 (RBK), that the defendant in that case was precluded from making such arguments before the jury.

*v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992). Even a statement by an anonymous declarant may be admissible if "the [G]overnment [can] show that the unknown declarant was more likely than not a coconspirator." *Id.* at 335 (quoting *United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir. 1985)).

As described in detail above, Sher was one of several co-conspirators in this extensive scheme. At trial, the Government will make the requisite showing, by a preponderance of the evidence, that the statements of his co-conspirators fall under Rule 801(d)(2)(E), as they were made during a conspiracy by declarants who were members of the same conspiracy as the defendant and were made during the course, and in furtherance, of that conspiracy. *See Bobb*, 471 F.3d at 498-99.

As to the first two elements, the Court need only find, by a preponderance of the evidence after considering the statement itself and other evidence at trial, that the conspiracy existed and that the declarant was more likely than not a co-conspirator. *See McGlory*, 968 F.2d at 333-36; *United States v. Cruz*, 910 F.2d 1072, 1080-83 (3d Cir. 1990). "[O]nce the Government establishes a defendant's involvement in an ongoing conspiracy, the burden shifts to the defendant to prove by affirmative acts inconsistent with the object of the conspiracy that he withdrew." *United States v. Gibbs,* 739 F.2d 838, 845 (3d Cir. 1984). The Ninth Circuit has even held that "admissions and statements of a co-defendant are admissible as against the other even in the absence of a conspiracy count where there is independent evidence of a concert of action." *United States v. Williams*, 435 F.2d 642, 645 (9th Cir. 1970).

As to the third and final element, the Third Circuit has explained that "[t]he

threshold for establishing that a statement was made in furtherance of a conspiracy is not high." *United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011). Additionally, the "in furtherance of" requirement has been given "a broad interpretation." *United States v. Weaver*, 507 F.3d 178, 183 (3d Cir. 2007) (quoting *Gibbs*, 739 F.2d at 845). For example, statements are made in furtherance of the conspiracy where they are: directed to the purpose of the conspiracy, *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983); "intended to promote the conspiratorial objectives of the conspiracy," *United States v. Weaver*, 507 F.3d 178, 184 (3d Cir. 2007) (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986)); merely inform the hearer about the status of the conspiracy; or intended to conceal the conspiracy so that the conspiracy can continue, in which case the hearer need not be a coconspirator, *Weaver*, 507 F.3d at 181-87. Moreover, discussions among co-conspirators about prior events still meet the "in furtherance of" requirement when the statements form the basis for informing co-conspirators about the overall status of the conspiracy. *Id.* at 184. Similarly, statements are admissible when a co-conspirator keeps other co-conspirators "abreast of developments to induce their continued participation" in the conspiracy. *Gibbs*, 739 F.2d at 846.

Given the vast scope of the conspiracy in this case, the Government anticipates evidence of numerous co-conspirator statements. The Court should find that the statements of Sher's co-conspirators are admissible at trial as non-hearsay under Rule 801(d)(2)(E).

**C.      Improper Character Evidence Should Be Excluded at Trial.**

The Government anticipates that Sher may attempt to present evidence or elicit testimony of his prior instances of "good conduct" or "good works" related to his position as a firefighter, including matters such as positive evaluations, promotions, awards, commendations, or other community service and accolades.  Similarly, Sher may also seek to introduce evidence of positive character traits affiliated with his role as a firefighter, including bravery, dedication, honor, and selflessness.  The Court should exclude such evidence at trial as inadmissible under the Federal Rules of Evidence.  Moreover, to the extent certain character evidence is permitted at trial through character witnesses, the Court should limit its use to the proper form required by the evidentiary rules.

**1.      Evidence of the Defendant's Good Character or Reputation is Inadmissible Under Rules 404 and 405.**

Federal Rule of Evidence 404 generally prohibits the introduction of evidence of a person's character to prove that a person acted in conformity with that character trait on a particular occasion.  The rule provides a narrow exception for the admission of character evidence related to the accused, but only when the evidence relates to a "pertinent," or relevant, character trait.  *See* Fed. R. Evid. 404(a)(1).[4]

---

[4]  Rule 404 provides, in pertinent part, as follows:

(a) Character Evidence. (1) Prohibited Uses. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. (2) Exceptions for a Defendant or Victim in a Criminal Case. The following exceptions apply in a criminal case: (A) a defendant may offer evidence of the defendant's pertinent

Assuming the criteria of Rule 404 has been met, under Rule 405,[5] evidence of a pertinent character trait generally cannot address specific instances of conduct, but rather must be in the form of testimony as to reputation or in the form of an opinion.[6] *See* Fed. R. Evid. 405(a).   However, "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct."   Fed. R. Evid. 405(b).[7]

---

trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]

[5] Rule 405 provides, in pertinent part, as follows:

> (a) By Reputation or Opinion. When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.  (b) By Specific Instances of Conduct. When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

[6] As noted in the Advisory Committee Notes to Rule 405: "evidence of specific instances of conduct is the most convincing.  At the same time, it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time.  Consequently, the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry."

[7] In addition to Rules 404 and 405, any such character evidence would be inadmissible under Rules 401 and 403 as irrelevant and unduly prejudicial to the Government. *See United States v. Warner*, 396 F. Supp. 2d 924, 941 (N.D. Ill. 2005) (rejecting former governor's claim that his "personal integrity and dedication to promoting the common good through public service" constitutes a character trait admissible under Rule 401(a)(1)), *aff'd*, 498 F.3d 666 (7th Cir. 2007).  Here, any evidence as to the Defendant's alleged good character has nothing to do with whether he conspired to commit health care or wire fraud.  This evidence would be unduly prejudicial to the Government and would mislead the jury, as its admission at trial could have a tendency to suggest that the jury make a decision on an improper basis. *See* Fed. R. Evid. 403, *Adv. Comm. Notes* ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

*United States v. Washington,* 106 F.3d 983 (D.C. Cir. 1997) is instructive on this point.  In *Washington*, the defendant was a police officer charged with bribery and corruption.  *Id.* at 992.  The defendant sought to introduce evidence of several commendations he received for his work while on the police force.  *Id.* at 999.  The appellate court upheld the district court's ruling excluding the evidence under Rules 404(a)(1) and 405, finding that: "the commendations were not admissible under either Rule because appellant's 'dedication, aggressiveness and assertiveness' in investigating drug dealing and carjacking is neither 'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged." *Id.*

Similarly, *United States v. Nazarro,* 889 F.2d 1158 (1st Cir. 1990) also rejected a defendant police officer's request to admit certain character evidence related to positive attributes and good works as a police officer.  In *Nazarro*, the defendant was charged with mail fraud and perjury.  *Id.* at 1160.  At trial, the defendant attempted to offer into evidence his resume and other anecdotal proof of commendations he received for his service in the military and police force, as well as a medal bestowed upon him for special valor.  *Id.* at 1168.  The appellate court affirmed the district court's decision to exclude the material, noting that "the traits which [the materials] purport to show—bravery, attention to duty, perhaps community spirit—were hardly 'pertinent' to the crimes of which Nazzaro stood accused." *Id.*

Moreover, this Court's sister court in the Eastern District of Pennsylvania addressed a similar argument in *United States v. Fumo*, Crim. No. 06-319.  In that

case, a state senator was charged with fraud and obstruction related to his misuse of state funds. Prior to trial, the Government successfully excluded the senator's legislative, policy, and constituent service accomplishments as impermissible character evidence under Rules 404 and 405. *See* Docket Nos. 253, 294.

Here, just as in *Washington, Nazarro,* and *Fumo*, any character evidence offered to prove Sher's alleged "good character"—such as bravery, attention to duty, honor and valor, commitment to public service, etc.—is not admissible under Rules 404(a) and 405 because it is not pertinent to the conspiracy and health care fraud charges brought against him. Evidence or testimony about Sher's prior good works or community service are likewise inadmissible.[8] Accordingly, the Court should preclude the Defendant from introducing such evidence and arguments at trial.

### 2. If Certain Character Evidence is Permitted at Trial, It Must be Limited in Form to Testimony as to the Witness' Opinion of the Defendant or the Defendant's Reputation.

The Federal Rules of Evidence allow a defendant to offer evidence of his good character to show, by inference, that the act with which he is charged is inconsistent with his overall character. *See* Fed. R. Evid. 404(a)(1); 1A J. Wigmore, *Evidence*, § 56, at 1161 (Tillers rev. 1983). However, even when character evidence may be admissible and potentially probative, the rules still limit its use at trial. As noted above, assuming the criteria of Rule 404 has been met, under Rule 405, evidence of a

---

[8] The Court should also exclude arguments that the jury should acquit Sher based upon sympathy or his alleged good character. Such argument is tantamount to jury nullification. *See United States v. DeMuro*, 677 F.3d 550, 565-66 (3d Cir. 2012).

pertinent character trait cannot address specific instances of conduct, but rather must be in the form of testimony as to reputation or opinion on direct examination. *See* Fed. R. Evid. 405(a); *Michelson v. United States,* 335 U.S. 469, 477 (1948).  On cross-examination, however, the Court may allow inquiry into relevant specific instances of the accused's conduct.  *See* Fed. R. Evid. 405(a).

Here, to the extent the Court permits the Defendant to call certain witnesses to testify that the acts with which he is charged are inconsistent with his overall character,[9] any such questions on direct examination must be in the form of reputation or opinion testimony and cannot inquire into specific instances of the Defendant's conduct and character under Rule 405(a).  *See Michelson*, 335 U.S. at 477 ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits[.]").  For example, a witness can testify that he is familiar with the Defendant's reputation and that he has a reputation for being honest.  The witness cannot, however, refer to

---

[9] The Court has broad discretion to limit the number of character witnesses called by the Defense at trial.  *See United States v. Sullivan*, 803 F.2d 87, 90 (3d Cir. 1986) (finding that district court did not abuse its discretion in excluding defendants' character witnesses on grounds that testimony was cumulative); *United States v. Johnson,* 730 F.2d 683, 688 (11th Cir. 1984) (affirming district court's decision to limit number of character witnesses to three).  Indeed, limiting the number of defense character witnesses is a common practice. *United States v. Gray,* 105 F.3d 956, 963 (5th Cir. 1997) (noting that "[t]his court has repeatedly allowed a maximum of three character witnesses"); *United States v. Benefield,* 889 F.2d 1061, 1065 (11th Cir. 1989) (affirming decision to reduce character witnesses from ten to five); *United States v. Koessel*, 706 F.2d 271, 275 (8th Cir. 1983) (affirming limitation of three character witnesses).  Here, the Government is not requesting that the Court limit the Defendant to calling a specific number of character witnesses.  Rather, at the appropriate time, the Government requests that the Court ask the Defendant to make a proffer to these witnesses' testimony and to limit the number of character witnesses based on that proffer.

any specific instances of good conduct or honesty engaged in by the Defendant. *See id.* ("The witness is [ ] allowed to summarize what he has heard in the community . . . [t]he evidence which the law permits is not as to the personality of the defendant but only as to the shadow his daily life has cast in his neighborhood.").

To the extent the Defendant calls any character witnesses to testify on his behalf, the Government would then be permitted to inquire into certain relevant specific instances of the Defendant's conduct on cross-examination. *See* Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."). This is because "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. . . . Thus, while the law gives [the] defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans." *Michelson*, 335 U.S. at 477. Thus, if Sher opens the door by calling character witnesses, the Government should be permitted on cross-examination to inquire about specific instances of his conduct.

> **D.   Witnesses and Spectators Should Be Barred from Wearing Uniforms or Insignia in the Courtroom So As Not To Unduly Influence or Intimidate the Jury.**

As noted above, Sher was a firefighter with the Margate Fire Department during the course of conspiracy. He recruited numerous family members and friends

to receive the compound medications—many of whom were firefighters, lifeguards, teachers, or other government and civic employees—because they had the requisite insurance plans that covered the medications.  The Government anticipates that several of these individuals may be called to testify at trial or otherwise be present in the gallery of the courtroom.

The presence of uniforms or insignia in the courtroom may affect the Government's right to a fair trial and may unduly influence or intimidate jurors.  For example, uniforms and insignia may unduly lend an air of credibility to the Defendant via his association with such individuals.  And, even if uniformed individuals do not actively seek to intimidate the jury, the mere presence of uniforms or insignia could nevertheless have that effect, which could in turn unduly influence the verdict.  Thus, the Government requests that the Court establish a courtroom rule that witnesses and courtroom spectators should not invoke the color of their offices or organizations by wearing a uniform, badge, or any other items that would identify them as public service officers and employees.

The Court has the power to dictate rules regarding courtroom attire and decorum and federal courts have previously created such rules to protect the integrity of the legal process.  *See e.g., United States v. Tsarnaev*, 157 F. Supp. 3d 57, 64 at n.9 (D. Mass. 2016) (referencing "decorum order" which, among other things, directed spectators not to wear or carry "'any clothing, buttons, or other items that carry any message or symbol addressing the issues related to this case that may be or become visible to the jury,' including law enforcement uniforms and badges"); *United States*

14

*v. Bodkins*, 2005 WL 1118158, at *3 (W.D. Va. May 11, 2005) (issuing order declaring "in order to protect the defendants' right to a fair trial, the court holds that participants and spectators will be prohibited from wearing or displaying any case specific items of any sort, reflecting support for either side").

To be clear, the Government does not request that public service officers and employees be barred from attending or testifying at trial. Rather, the Government merely requests that, if such individuals do attend or testify at trial, that they refrain from wearing a uniform, badge, or any other items that would identify them as public service officers and employees to the casual observer. This minor restriction will help to ensure that the jury will not be unduly intimidated or influenced.

### E. The Government Should Be Permitted to Ask Leading Questions on Direct Examination if Witnesses Demonstrate Hostility or Identify with an Adverse Party.

It is possible that, in the course of presenting witness testimony during the Government's case-in-chief, certain witnesses will demonstrate hostility. For example, witnesses may be unwilling to respond directly to questions, feign forgetfulness, or may demonstrate a churlish disposition. If this occurs, the Government should be permitted to question hostile witnesses with leading questions as if on cross-examination pursuant to Federal Rule of Evidence 611(c).[10]

When a witness is identified as having a relationship with an adverse party,

---

[10] Rule 611(c) provides, in pertinent part, as follows: "Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions . . . when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."

the Court has discretion to permit the Government to ask leading questions on direct. *See United States v. Hicks,* 748 F.2d 854, 859 (4th Cir. 1984); *Hainey v. Mizell Memorial Hosp.,* 744 F.2d 1467, 1477-78 (11th Cir. 1984) (finding that actual hostility is not required if witness is "identified with" opposing party); *Ellis v. Chicago,* 667 F.2d 606, 612 (7th Cir. 1981).  Whether a witness is hostile or identified with an adverse party involves consideration of several factors, including: the nature of the witness' relationship with a party, demeanor, facial expression, voice inflections, and whether the witness' answers are evasive.  *See United States v. Tunnell,* 667 F.2d 1182, 1188 (5th Cir. 1982); *United States v. Brown,* 603 F.2d 1022, 1025 (1st Cir. 1979) (recognizing that witness was close friend of defendant); *United States v. Cisneros-Gutierrez,* 517 F.3d 751, 762 (5th Cir. 2008) (noting that a hostile witness can be one who feigns memory loss or is reluctant to divulge memory).  And, in instances where witnesses may have participated in events that are in some way related to the alleged criminal activity, the Court has discretion to allow the Government to ask leading questions as if on cross.  *See Brown,* 603 F.2d at 1026.

Many of the witnesses that the Government anticipates calling in its case-in-chief were participants in events related to the crimes with which Sher is charged.  Indeed, Sher worked alongside his brothers in recruiting individuals to receive prescriptions for the compound medications—both of whom have been charged for their conduct in the conspiracy.  The Defendant recruited numerous family members and close friends to receive the medications.  The Government anticipates calling several of these individuals to the stand during its case-in-chief.  It is highly possible

that, while testifying on direct examination, these individuals may demonstrate the characteristics that courts generally have recognized as evincing hostility towards the questioning party. Should this occur, the Government requests that it be permitted to treat such witnesses as hostile and to use leading questions on direct examination of these witnesses.

### F.   Prior Grand Jury Testimony Should Be Admitted as Substantive Evidence if Witnesses Claim Memory Loss or Equivocate During Their Trial Testimony.

During the investigation of the conspiracy, several individuals testified before the grand jury. The Government anticipates that several of these individuals will now be called to testify at trial. To the extent that witnesses who testified before the grand jury now claim memory loss or equivocate during their trial testimony, the Government seeks admission of their prior grand jury testimony as substantive evidence.

Sworn prior inconsistent statements are admissible as substantive evidence under Rule 801(d)(1)(A) if the declarant is available for cross-examination in the current proceeding. It is well-established that poor recall of events, equivocation, and claims of memory loss satisfy the requirement of "inconsistent" testimony under this rule. *See United States v. Mornan*, 413 F.3d 372, 379 (3d Cir. 2005); *United States v. Mayberry*, 540 F.3d 506, 516 (6th Cir. 2008) (finding grand jury testimony admissible as substantive evidence after witness claimed memory loss); *United States v. Tran*, 568 F.3d 1156, 1163 (9th Cir. 2009) (admitting portion of plea agreement into evidence at trial that was inconsistent with reluctant and evasive in-court testimony).

Although the Third Circuit has noted that a prior statement should not be admitted if the witness' current memory loss regarding that statement is genuine, *United States v. Palumbo*, 639 F.2d 123, 128 n.6 (3d Cir. 1981), it has held that a prior statement may be admitted under Rule 801(d)(1)(A) where the witness' memory loss is not genuine. *See Mornan*, 413 F.3d at 379; *United States v. Odom*, 627 F. App'x 151, 153-54 (3d Cir. 2015) (noting that admission of grand jury testimony as prior inconsistent statement was not an abuse of discretion because witness' claim of memory loss appeared to be disingenuous); *United States v. Gerard*, 507 F. App'x 218, 221-22 (3d Cir. 2012) (finding that witness' prior grand jury testimony was admissible where witness' trial testimony "was a complete reversal of her sworn grand jury testimony, in which she offered a detailed, first-person account"); *United States v. Iglesias*, 535 F.3d 150, 159 (3d Cir. 2008) ("[W]here a witness demonstrates a 'manifest reluctance to testify' and 'forgets' certain facts at trial, this testimony can be inconsistent under Rule 801(d)(1)(A)."); *United States v. Bigham*, 812 F.2d 943, 946-47 (5th Cir. 1987) (admitting prior grand jury testimony where the witness "was obviously [ ] evasive and reluctant [ ] and the trial judge reasonably could have concluded that his loss of memory was feigned").

The Court has broad discretion to determine if an evasive answer is inconsistent with statements made in another proceeding. This is so because the policy behind Rule 801(d)(1)(A) is to "provide a party with desirable protection against the turncoat witness who changes his story on the stand and deprives the party calling him of evidence essential to his case." *Bigham*, 812 F.2d at 946-47. Thus,

18

partial or vague recollection is deemed to be inconsistent with total or definite recollection. *United States v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981); *see also United States v. Marchand*, 564 F.2d 983, 999 (2d Cir. 1977) (allowing the admission of grand jury testimony where the witness forgot or denied facts at trial). Further, as noted in *Argnellino v. New Jersey*, 493 F.2d 714, 730 (3d Cir. 1974), "[a] complete answer to a question may be as inconsistent with a partial reply as one completely different in detail." If the prior statement indicates that, at an earlier time, the witness remembered the events about which he testified with more certainty or in more detail, then it is permissible to admit the prior statement of the witness who recalled the event incompletely or with some equivocation. *Distler*, 671 F.2d at 958.

Thus, in the event that a witness claims an inability to recall certain facts or is evasive in testifying about details previously provided before the grand jury, the Government requests that the Court find that such statements are admissible under Rule 801(d)(1)(A) and admit such testimony as substantive evidence at trial.

## G. The Court Should Preclude Any Reference to Possible Punishment or Collateral Consequences of Conviction.

The Court should preclude the Defense from referring—whether directly or indirectly—to issues concerning possible punishment should the Defendant be convicted on any or all of the counts in the Indictment. This preclusion should extend to discussion or mention of possible collateral consequences, such as potential impact on the Defendant's livelihood or ability to collect his state pension. This preclusion should apply to opening and closing statements, cross-examination of Government

witnesses, direct examination of defense witnesses, documentary exhibits, and any statements made in open court before the jury.

The jury's sole function is to determine guilt or innocence.  Evidence regarding punishment or the effects of conviction is irrelevant and inadmissible before the jury. The punishment provided by law upon conviction is a matter exclusively within the province of the Court and should never be considered by the jury in any manner in arriving at their verdict as to guilt or innocence.  *See Beavers v. Lockhart*, 755 F.2d 657, 662 (8th Cir. 1985) ("Historically, the duty of imposing sentence has been vested in trial judges."); *United States v. Brown*, 744 F.2d 905, 909 (2d Cir.), *cert. denied*, 431 U.S. 941 (1977).[11]

The presentation or insinuation of such information to the jury creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact their deliberations.  "The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged." *Shannon v. United States*, 512 U.S. 573, 579 (1994).  Providing jurors with information regarding sentencing or collateral consequences of conviction invites them to consider matters outside the facts and evidence and "creates a strong possibility of confusion." *Id.*; *see also Pope v. United States*, 298 F.2d 507, 508 (5th

---

[11] Indeed, Third Circuit Model Criminal Jury Instruction § 3.16—which this Court routinely provides to the jury in its instructions—states that: "If you decide that the Government has proved a defendant guilty of a crime, then it will be my responsibility to decide what the appropriate punishment should be.  You should never consider the possible punishment in reaching your verdict."  The Government will include this jury instruction in its proposed jury instructions.

Cir. 1962); *Rogers v. United States*, 422 U.S. 35, 40 (1975); *United States v. Greer*, 620 F.2d 1383, 1385 (10th Cir. 1980) (noting that, absent a statutory requirement that the jury participate in the sentencing decision, nothing is left for jury determination beyond the guilt or innocence of the accused).

Evidence which relates to the issue of punishment upon conviction of a criminal offense has no bearing on the only question that the jury will be called upon to decide at trial: Sher's guilt or innocence.  Thus, any evidence or insinuation as to punishment or collateral consequences should be barred at trial.

**H.     The Defendant Should Be Ordered to Provide Reciprocal Discovery to the Government As Soon As Possible.**

The right of the Government to reciprocal discovery from the Defense is firmly established in Rule 16(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure. This provision allows the Government, upon compliance with a legitimate request by a defendant for similar material, to:

> inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at trial.

Fed. R. Crim. P. 16(b)(1)(A).

Under the clear language of this rule, courts uniformly have allowed reciprocal discovery.  *See, e.g., United States v. Bump*, 605 F.2d 548, 551-52 (10th Cir. 1979) (requiring reciprocal disclosure over defendant's objection that it would violate his constitutional rights); *United States v. Sherman*, 426 F. Supp. 85, 93 (S.D.N.Y. 1976).

21

To date, the Government has produced over 330,000 documents to the Defense in discovery. Since discovery has been made available to the Defense, the Government is entitled—pretrial—to reciprocal discovery under Rule 16(b). To the extent the Defendant has any discovery in his possession, he should be ordered to provide these materials to the Government as soon as possible in advance of trial.

\* \* \*

For the reasons set forth above, the Court should grant the Government's Motions in their entirety.

Respectfully Submitted,

CHRISTINA O. HUD
DESIREE L. GRACE
Assistant U.S. Attorneys
United States Attorney's Office
District of New Jersey

## **CERTIFICATE OF SERVICE**

I, Christina O. Hud, hereby certify that I served the Government's Motions in Limine and for Reciprocal Discovery on the below counsel via electronic filing on ECF/PACER:

Joseph P. Grimes, Esq.
810 Asbury Avenue - Suite 212
Ocean City, NJ 08226
JGrimesEsq@Gmail.com


_____
CHRISTINA O. HUD
Assistant U.S. Attorney
United States Attorney's Office
District of New Jersey

Date: July 18, 2022